# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

GENE BADGER, JOHN LOVE, MARVIN
EVANS,  SID BANACK,  JOHN WILLIS,
ALL ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY
SITUATED,

Plaintiffs,

-vs-                                                    Case No.  6:06-cv-637-Orl-28KRS

SOUTHERN FARM BUREAU LIFE
INSURANCE COMPANY,

Defendant.

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (Doc. No. 38)** |
| **FILED:** | **September 26, 2007** |

**I.      PROCEDURAL HISTORY**.

On May 11, 2006, Plaintiffs Gene Badger, John Love, Marvin Evans, Sid Banack, and John Willis filed a two-count class action complaint against Defendant Southern Farm Bureau Life Insurance Company (Southern Life) alleging violations of § 10(b) of the Securities Exchange Act of

1934, Rule 10b-5 (codified at 17 C.F.R. § 240.10b-5) and Florida common law fraud.  Doc. No. 1 (Compl.).  The named plaintiffs allege, on behalf of a proposed plaintiff class, that they were forced to sell their shares in Plaintiffs' Shareholders Corporation (PSC) as a result of Southern Life's fraudulent and unlawful omissions and misrepresentations of material facts with regard to Southern Life's purchase of a security, referred to herein as the Debenture, held by PSC.  Compl. ¶ 1.

Subsequently, on August 22, 2006, the named plaintiffs filed a two-count verified shareholders derivative complaint on behalf of PSC against Southern Life and PSC for violations of § 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 and Florida common law fraud. *See Badger v. Southern Farm Bureau Life Insurance Company*, 6:06-cv-1253-ORL-19JGG, doc. no. 1.  As the parties in both actions are the same, with the exception of PSC as a nominal defendant in the derivative action, and the cases have common questions of law and fact, the cases were consolidated into the present action. *Id*., doc. no. 22.  The present motion, however, addresses only the class action complaint.

The named plaintiffs filed the present motion seeking class certification on September 26, 2007.  In their motion, the plaintiffs request that the Court certify a class consisting of all shareholders of PSC who owned shares in PSC on or after September 29, 2004, through and including October 15, 2004, but excluding Southern Life, its officers and directors, employees, affiliates, legal representatives, heirs, predecessors and assigns, and any entity in which Southern Life has a controlling interest.  Doc. No. 38 at 5.  The named plaintiffs further request that they be appointed as class representatives and that the law firm of Baker & Hostetler LLP be appointed as class counsel. Doc. No. 38 at 5.

In support of the motion, the plaintiffs filed the following documents:

•   The Stipulation of Settlement in the case of *Winchester v. Florida Farm Bureau Equities, Inc.*, No. 1:84-cv-00148-MMP (N.D. Fla. 1984), doc. no. 38-3 (Stip. of Settl.);

•   Excerpts from deposition transcript of Earl Ference, doc. no. 38-4 (the complete transcript is filed at doc. no. 39-2)(Ference Dep.);

•   Proxy Statement for Special Meeting of Stockholders of PSC, doc. no. 38-5 (Proxy Stat.);

•   Florida Farm Bureau Holding Corporation Convertible Debenture, doc. no. 38-6 (Debenture);

•   Agreement and Declaration of Trust, doc. no. 38-7 (Trust Agm't);

•   Document entitled Charter Policies in Force 12-31-02, doc. no. 38-8;

•   Excerpts from deposition transcript of Perry McGaugh, doc. no. 38-9 (the complete transcript is filed at doc. no. 39-3)(McGaugh Dep.);

•   June 8, 2004 e-mail from Rick Fielding to Jack Gibson, doc. no. 38-10;

•   Valuation of Debenture, doc. no. 38-11 (Valuation);

•   Affidavit of Jerry R. Linscott, doc. no. 38-12;

•   Affidavit of Eugene Badger, doc. no. 38-13 at 1-3 (Badger Aff);

•   Affidavit of John Love, doc. no. 38-13 at 4-5 (Love Aff.);

•   Affidavit of Marvin Evans, doc. no. 38-13 at 6-7 (Evans Aff.);

•   Affidavit of Sidney Banack, doc. no. 38-13 at 8-9 (Banack Aff.);

•   Affidavit of John Willis, doc. no. 38-13 at 10-11 (Willis Aff.).

Southern Life filed a memorandum in opposition to the motion for class certification.  Doc. No. 40.  In support of its opposition, it filed the following documents not previously filed by plaintiffs:

- October 26, 2007 e-mail to Kay Payton, doc. no. 40-2;

- Excerpts from deposition transcript of Sidney Banack, Jr., doc. no. 40-3;

- Excerpts from deposition transcript of John Y. Willis, Sr., doc. no. 40-4;

- An Extension Agreement, doc. no. 40-5;

- Excerpts from deposition transcript of Gene Badger, doc. no. 40-7;

- Excerpts from deposition transcript of Marvin Evans, doc. no. 40-8;

- Sign-in sheet and tally of final shareholder votes, doc. no. 40-9;

- A document entitled Assignment, doc. no. 40-10 (Assignment);

- Settlement Agreement, doc. no. 40-11; and

- Baker & Hostetler's Letter of Engagement, doc. no. 40-12.

The plaintiffs filed a reply to Southern Life's response.  Doc. No. 43.  In support of the reply memorandum, the plaintiffs filed:

- PSC's Articles of Incorporation, doc. no. 43-2 (Art. of Incorp.); and

- The Supplemental Affidavit of John Willis, doc. no. 43-3 (Willis Supp. Aff.).

The Honorable John Antoon, II, presiding district judge referred the motion for class certification to me for issuance of a Report and Recommendation.

## II.    FACTUAL BACKGROUND.

To understand the present motion, it is necessary to review the history leading to the sale of the Debenture that underlies the complaint.

A.      *Southern Life and the Trust Agreement.*

Southern Life is a privately held company incorporated in Mississippi and authorized to do business in Florida.  Compl. ¶ 13.  Southern Life's issued and outstanding shares of common stock are owned equally by ten holding companies, one of which is Florida Farm Bureau Holding Corporation (Florida Holding).  *Id.* ¶ 14.   All of the stock in the holding companies is, in turn, held by one of ten state farm bureau federations.  *Id.* ¶ 15.

In July 1947, the initial holding companies and the state farm bureau federations that owned the stock in these holding companies entered into the Trust Agreement.  Compl. ¶ 17.  The Trust Agreement was originally created to benefit the 20,000 original charter policyholders who purchased an insurance policy offered by Southern Life on or before May 1, 1947.  Compl. ¶ 18. The Trust Agreement was amended in 1972, 1973, and 1984 to include, as if they were original signatories to the Trust Agreement, all of the current holding companies and state farm bureau federations.  Compl. ¶ 17.

The Trust Agreement was designed to ensure that the charter policyholders would receive, at most, three times their gross annual premiums over each three-year period as a return on non-transferable participation certificates that were issued to the charter policy holders (Participation Payments). *Id.* ¶ 19.  To accomplish this, the Trust Agreement required each holding company to transfer dividends paid by Southern Life in an amount in excess of  $5,700.00 to a trust committee, which was responsible for annually distributing the participation payments.  Trust Agm't at 4-5; Compl. ¶¶ 21, 22.

While the Trust Agreement limits the amount of distributed dividends that Southern Life's shareholders can retain, it does not place any restrictions on the amount of dividends Southern Life

can pay. Compl. ¶ 23.  The plaintiffs allege, however, that "Southern Life has relied on the Trust Agreement to avoid paying any reasonable dividends to its ten holding company stockholders, including Florida Holding, and thereby has been able to accumulate a rapidly increasing net worth that in 2004 exceeded one billion one hundred million dollars ($1,100,000,000.00)." *Id.*

At the time of the sale of the Debenture, the Trust Agreement provided that it would terminate within three years after the maturity of the last surviving charter policy holder contract. *Id.* ¶ 20.[1] Each of the charter policies matures when the policyholder reaches the age of 85 or upon death, whichever event occurs first. *Id.*  As of December 31, 2002, of the original 20,000 charter policies, 3,283 had not matured.  Doc. No. 38-8.  Southern Life estimated that the last of these remaining policies would mature between the years 2028 and 2032. *Id.*

> B. *The Formation of PSC.*

In 1987, shareholders in Florida Farm Bureau Equities, Inc. (Equities) filed a Rule 10b-5 class action complaint against Equities, Florida Farm Bureau Federation, and Southern Life in the case of *Winchester v. Florida Farm Bureau Equities, Inc.*, No. 1:84-cv-00148-MMP (N.D. Fla. 1984). Compl. ¶ 6; Stip. of Settl. ¶ 1.  "The amended complaint generally alleged that the defendants, among other things, engaged in actionable conduct by participating in and causing the sale of FLORIDA FARM BUREAU LIFE INSURANCE COMPANY ("Florida Life") to Southern Life for less than its true value and for diverting a portion of the value received from the sale away from Equities' minority shareholders."  Stip. of Settl. ¶ 5.

---

[1] After the Debenture transaction discussed below, the Trust Agreement was amended to extend into perpetuity.  McGaugh Dep. at 96.

The parties in the *Winchester* case reached a settlement and entered into a 1987 settlement agreement.[2]  *Id.* ¶ 8.   Under the settlement agreement, Florida Holding, which held 10% of the common capital stock of Southern Life, was required to "issue to a corporation, partnership, trust or other entity to be formed" by the *Winchester* class members a debenture convertible into 27.7% "of the outstanding common capital stock of Florida Holding."  *Id.* ¶ 12(d)(hereinafter the Debenture). This effectively made the entity to be created by the *Winchester* class members the beneficial owner of 2.77% of the stock of Southern Life.   Compl. ¶ 6.   As such, the entity to be created by the *Winchester* class members was also entitled to payment of 2.77% of all dividends declared by Southern Life.  *Id.* ¶ 7.

The *Winchester* class members incorporated Plaintiffs' Shareholder Corporation (PSC) in Florida, and Florida Holding issued the Debenture to PSC. Compl. ¶¶ 6, 9; Art. of Incorp. at 2. PSC was formed solely to comply with the terms of the settlement agreement and to hold the Debenture for the benefit of the *Winchester* class members.  Proxy Stat. at 1-2; Ference Dep. at 22;[3] Badger Aff. ¶ 3.  The Debenture and some cash were PSC's sole assets; PSC did not otherwise conduct business.  Proxy Stat. at 1; Badger Aff. ¶ 3; Ference Dep. at 22.   Under its Articles of Incorporation, PSC was specifically given the power to "make and enter into contracts and agreements concerning the

---

[2] In both the present action and in the derivative action, Southern Life moved that the cases be transferred to the Northern District of Florida or be dismissed because the Northern District of Florida retained jurisdiction over the *Winchester* settlement.  Doc. No. 7.  The Court denied Southern Life's motion, finding that the claims presented in this case are factually distinct from those in *Winchester* and that the cases need not be transferred or dismissed to protect the *Winchester* settlement.  Doc. No. 17.

[3] I will use the internal pagination of deposition transcripts rather than the pagination assigned when the transcripts were electronically filed.

Debenture or necessary or convenient to the care, custody, administration or sale of the Debenture .

. . ." Art. of Incorp. Art. VII ¶ 3.

PSC was to have a limited duration.  Pursuant to the Articles of Incorporation, "[i]n the event

that [PSC] either sells or otherwise conveys the Debenture or the Florida Holding Stock . . . [PSC]

shall, as soon as reasonably practicable thereafter, distribute the proceeds thereof to the holders of the

Settlement Stock after which the Corporation shall dissolve." Art. of Incorp. Art. VIII.  Nevertheless,

as of August 9, 2007, PSC remained an active corporation, and no dissolution proceedings had begun.

Ference Dep. at 69.

C.      *The Debenture.*

The Debenture provides as follows:

> [PSC] shall be entitled to receive the same financial benefits it would receive if it
> owned outright 27.7% of the capital stock of the Company.  Accordingly, in the event
> Southern Life pays any cash dividends to holders of its stock, then in such event,
> [PSC] shall be entitled to receive a payment hereunder of an amount equal to 27.7%
> of such dividends received by [Florida Holding] on the shares of capital stock of
> Southern Life owned by [Florida Holding].

Debenture at 3.

The *Winchester* class members each received a *pro rata* interest in the Debenture which

corresponded to the minority interest they had in Equities prior to the sale of Florida Life.  Stip. of

Settl. ¶ 12(d).  These interests were represented by shares of stock in PSC.  Badger Aff. ¶ 3; Proxy

Stat. at 2.

Under the terms of the Debenture, the Debenture would automatically convert into Florida Holding's capital stock upon the earliest of the following events:

(I)      the termination of the Trust Agreement;

(ii)     the elimination or modification of the restrictions in the Trust Agreement that would permit the transfer of capital stock of Florida Holding; or

(iii)    the bankruptcy, insolvency, reorganization, liquidation, dissolution, or receivership of Southern Life.

Debenture at 1-3.

E.      *The Sale of the Debenture to Southern Life.*

On April 5, 2002, the individual named plaintiffs in the present action, with the exception of John Willis, brought a shareholders derivative action on behalf of PSC against Southern Life in Florida state court, alleging that Southern Life had failed to pay reasonable dividends to Florida Holding, thus depriving the shareholders of PSC of their share of such dividends.  Compl. ¶ 24; *see Badger v. Southern Farm Bureau Life Ins. Co.*, Case No. 48-2002-CA-003303-O (Fla. 9th Jud. Cir. Apr. 5, 2002).   On August 24, 2004, before any discovery on the merits occurred, Southern Life offered to, and ultimately did, purchase the Debenture from PSC, which foreclosed any further consideration of that action.  Compl. ¶ 24.

Southern Life offered to purchase the Debenture for a total purchase price of $3,300,000.00.  Proxy Stat. at 2.  Southern Life's offer was based upon an analysis of the value of the Debenture (hereinafter the Valuation) performed by the actuarial firm Towers Perrin Forster & Crosby, Inc. (Towers Perrin).  Proxy Stat. at 2; Valuation; McGaugh Dep. at 58-60.

The Valuation assumed that, based on an analysis done by Southern Life, the Debenture would not convert to 27.7% of common stock of Florida Holdings until 2033.  Valuation at 1-2.  In 2033, the

Valuation estimated that Southern Life would have a total value of $5.737 billion.  Valuation at 10. In determining the current value of the Debenture, the Valuation applied an actuarial discount rate of 14% for each year from 2004 through 2033, which resulted in the Debenture having a current value of $3,300,000.00.  Valuation at 6-7.  To support its offer, Southern Life provided PSC with a copy of the Valuation and its 2003 year end financials.  McGaugh Dep. at 64.

On September 22, 2004, PSC retained the services of its own actuary, Harold G. Ingraham, Jr., to render an opinion concerning the Valuation, specifically regarding the discount rate of 14% used by Towers Perrin.  Proxy Stat. at 2; Compl. ¶ 32.  In analyzing the Valuation, Ingraham relied on all of the same information used by Towers Perrin.  Compl. ¶ 32.  Ingraham concluded that a reasonable discount rate could vary between 11% and 14%.  Proxy Stat. at 2.  Based on Ingraham's analysis, the PSC board countered Southern Life's offer and informed Southern Life that it would sell the Debenture for $4.4 million in cash.  *Id*. at 2.  Southern Life responded by making a counter-offer to purchase the Debenture for $3.3 million in cash and a $1.1 million promissory note to be paid in not more than two years with interest.  *Id*.  On September 27, 2004, PSC's board accepted Southern Life's counter-offer subject to the approval of the shareholders.  *Id*.

PSC's president, Royal French, sent a letter to PSC's shareholders giving them notice of the special meeting of the shareholders which was to be held on October 15, 2004, at which time a vote would be held on Southern Life's offer to purchase the Debenture for $4.4 million.  Ference Dep. at 25-26.  Included with the letter was the Proxy Statement, the Valuation, the Ingraham Report, PSC's financial statement for January 1, 2004 through August 31, 2004, copies of provisions of the Florida Corporations Act, and a Proxy Form for voting on the proposed sale of the Debenture.  Ference Dep.

at 37.  PSC's board recommended approval of the sale of the Debenture based on these documents.

Proxy Stat. at 3.

In order for PSC to sell the Debenture, a majority of PSC stockholders were required to vote

in favor of the sale.  McGaugh Dep. at 63.  The vote to sell the Debenture affected all shareholders

because a majority vote approving the sale required all PSC shareholders to convert their interest in

the Debenture into proceeds from the sale.  Compl. ¶¶ 38-39.  A majority of PSC's shareholders voted

to approve the sale of the Debenture to Southern Life for $4.4 million.  *Id*. ¶¶ 31, 37.  The named

plaintiffs in the present case voted against the sale.  Badger Aff. ¶ 4; Love Aff. ¶ 4; Evans Aff. ¶ 4;

Banack Aff. ¶ 4.[4]  PSC sold the Debenture to Southern Life on October 15, 2004.  Assignment at 1.

"It is Southern Life's fraudulent omissions and misrepresentations in connection with its

purchase of the Debenture that are the subject of the instant action."  Compl. ¶ 24.  Specifically,

the plaintiffs allege that "Southern Life knowingly and intentionally misrepresented to Towers Perrin,

and subsequently to PSC and Plaintiffs, that the Trust Agreement was not expected to terminate until

2033 and that the Debenture would not or was not expected to convert into actual stock of Florida

Holding until that time."  *Id.* ¶ 26.  The plaintiffs further allege that substantially all of the original

20,000 charter policy holders have died or their policies have lapsed and, with the company being

valued at over $1,100,000,000.00, there is no need to maintain the Trust.  *Id*. ¶ 27.

The plaintiffs further allege that if Southern Life had disclosed to Towers Perrin that PSC had

a present right to convert the Debenture into Florida Holding stock, "the Debenture would have been

---

[4]  Plaintiff Willis initially averred that he had voted in favor of the sale.  Willis Aff. ¶ 4.
After reviewing the voting tally sheet, his recollection was refreshed that he voted against the sale.
Willis Supp. Aff. ¶ 2.

valued, using Southern Life's own actuarial data, at $34,868,760, or 2.77% of Southern Life's 2004 estimated total value of $1.259 billion." Compl. ¶ 28. Consequently, the plaintiffs allege that Southern Life's omissions caused Tower Perrin to understate the value of the Debenture by more than 90%, or approximately $31.6 million. Compl. ¶ 30.

## III.   CLASS CERTIFICATION STANDARD.

"Questions concerning class certification are left to the sound discretion of the district court." *Cooper v. Southern Co.*, 390 F.3d 695, 711 (11th Cir. 2004); *see also Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038-39 (5th Cir. Unit A July 1981) (stating that class certification issues in a securities fraud case are "left to the sound discretion of the district court."). "For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004).

Rule 23(a) allows a class to be certified if:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, as the plaintiffs are seeking certification under Rule 23(b)(3), they must show that: (1) there are questions of law or fact common to the members of the class that predominate over those questions affecting individual class members only, and (2) a class action is superior to other available methods for fair and efficient adjudication of the controversy. "The burden

of proof to establish the propriety of class certification rests with the advocate of the class." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).

"[N]othing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). However, "both the Supreme Court and [the United States Court of Appeals for the Eleventh Circuit] have noted since *Eisen* that evidence pertaining to the requirements embodied in Rule 23 is often intertwined with the merits, making it impossible to meaningfully address the Rule 23 criteria without at least touching on the 'merits' of the litigation." *Cooper*, 390 F.3d at 712.

## IV.    ANALYSIS.

### A.    *Standing.*

Before analyzing the requirements of Rule 23, the Court must determine whether any of the named plaintiffs have standing to bring the causes of action asserted in the complaint. *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) ("[A]ny analysis of class certification must begin with the issue of standing . . . ."). "[I]t is well-settled that prior to the certification of a class and . . . before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

### 1.    Violation of § 10(b) of the Securities Exchange Act and Rule 10b-5.

Southern Life argues that the Court should not certify the putative class because the plaintiffs, individually and as a class, lack standing to pursue their claims for violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. In order to bring a claim under §10(b) and Rule

10b-5, a plaintiff must be a "purchaser or seller" of a security. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730-31 (1975) (affirming the ruling in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), "that the plaintiff class for purposes of a private damage action under § 10(b) and Rule 10b-5 was limited to actual purchasers and sellers of securities.").

### a.    The Plaintiffs as Sellers of Securities.

In their motion for class certification, the plaintiffs argue that they meet the "seller" requirement of § 10(b) and Rule 10b-5 because, as PSC shareholders, they authorized the sale of the Debenture by PSC to Southern Life. Doc. No. 38 at 27. According to the plaintiffs, "Southern Life offered to purchase the Debenture from PSC, knowing that a majority vote of the PSC shareholders was required to approve the sale since the Debenture was the only asset of PSC." Doc. No. 38 at 27. Thus, they contend that because the Debenture could not have been sold without shareholder approval, the shareholders should be deemed to be the sellers of the Debenture.

The plaintiffs do not cite any legal authority supporting their argument, and I have found none. I note that the Supreme Court observed in *Blue Chip Stamps*, albeit in dicta, that the *Birnbaum* purchaser/seller requirement precluded shareholders who suffered loss in the value of their investments due to corporate or insider activities in connection with the purchase or sale of securities from bringing a direct action for violation of § 10b and Rule 10b-5. 421 U.S. at 737-38.

There are cases in which courts found that shareholders who voted in favor of a merger of corporations had standing to bring a direct cause of action for securities fraud. *See, e.g., Junker v. Crory*, 650 F.2d 1349 (5th Cir. Unit A July 1981)(and cases cited therein). However, in those cases the shareholders engaged in a securities transaction by exchanging their shares in the acquired corporation for shares in the acquiring corporation. *Id.* at 1359 & n.15. In this case, no such exchange

occurred.  Rather, the named plaintiffs held and continued to hold shares in PSC before and after the Debenture was sold.

The named plaintiffs' position in the present case is more analogous to the circumstances in *Rekant v. Desser*, 425 F.2d 872 (5th Cir. 1970).  In that case, Plaintiff Rekant was a shareholder in World-Wide Realty and Investing Corporation.  World-Wide advised its shareholders that it was purchasing various assets that would produce revenue for World-Wide.  Rekant alleged that after the assets were purchased by World-Wide, they were fraudulently transferred to corporate insiders, thereby reducing the assets of the corporation and the value of Rekant's shares in World-Wide.  Rekant filed a complaint for violation of § 10b and Rule 10b-5 derivatively on behalf of World-Wide, and individually on behalf of himself and other shareholders of World-Wide, alleging that he and the other World-Wide shareholders relied to their detriment on World-Wide's false statements regarding the value to World-Wide of the assets purchased in deciding to hold rather than sell shares in World-Wide.  The Fifth Circuit concluded that Rekant could proceed on the derivative action but that he did not have standing to proceed on the individual and class action claims.  It held that Rekant's "failure to purchase or sell his stock, as opposed to holding it, is fatal to his individual and representative actions." *Id.* at 879.

Accordingly, because the named plaintiffs did not sell or exchange their shares of PSC stock for shares of stock in another company as a result of the Debenture sale, their status as voting shareholders in PSC is insufficient to make them sellers of securities with standing to bring individual causes of action for violation of § 10(b) and Rule 10b-5.

**b.     The Forced Seller Doctrine.**

The plaintiffs argue, alternatively, that they are sellers of the Debenture based on the forced seller doctrine because, as a result of Southern Life's fraud in connection with the purchase of the Debenture, they were left with shares in a corporation whose only reason for existing, holding the Debenture, was completed.  Doc. No. 43 at 6.  They argue that PSC ceased being an "existing entity" and is no longer a going concern.  *Id.* at 7.  Southern Life asserts that because PSC has not been dissolved, the plaintiffs' investments remain the same – they are stockholders in PSC.

The forced seller doctrine is an exception to the requirement in § 10(b) and Rule 10b-5 that an individual must actually be a seller of stock.  The forced seller doctrine was first conceived by the United States Court of Appeals for the Second Circuit in the case of *Vine v. Beneficial Finance Company*, 374 F.2d 627 (2d Cir. 1967).  In that case, after a short form merger,[5] a shareholder who had no right to vote in the merger was left with only three options:  (1) selling his shares at the price contained in the merger offer; (2) obtaining an appraisal of the stock resulting in purchase of the shares in cash for the appraised amount; or, (3) holding certificates of ownership in the acquired, and now non-existent, corporation.  *Id.* at 634.  One minority shareholder, Leo Vine, filed a class action complaint for violations of § 10b and Rule 10b-5. He alleged that Beneficial, the acquiring corporation, acting in concert with the officers and directors of Crown, the acquired corporation, arranged for Beneficial to buy sufficient shares of Class B stock in Crown to give it the necessary

---

[5] The term "short form merger" refers to the governing state law that authorized a corporation (the acquiring corporation) that owned at least 90% to 95% of the outstanding shares of each class of another corporation (the acquired corporation) to merge the acquired corporation into the acquiring corporation without the authorization of the shareholders of the acquired corporation, on approval of the board of the acquiring corporation. *Vine*, 374 F.2d at 633-34.

ownership interest to effect a short form merger and, thereafter, defrauded the Class A shareholders of Crown by paying less than fair market value for Crown and by diverting portions of the purchase price for the stock to the Class B shareholders of Crown.

The defendants moved to dismiss the complaint, arguing that Vine was not a seller of securities as required to maintain the securities fraud cause of action. The presiding district judge granted the motion, but the Second Circuit reversed that decision. The Second Circuit reasoned that, "in order to realize any value for his stock, [Vine] must exchange [his] shares for money from [Beneficial;] as a practical matter [Vine] must eventually become a party to a 'sale,' as that term has always been used." *Id.* at 634. Accordingly, the Second Circuit found that Vine was a forced seller, even though he still held stock certificates in Crown, which was then a non-existent corporation.

The defendants also argued that Vine could not "be a defrauded seller because nothing was asked of him, no representations were made to him . . . . [and] nothing had to be communicated to him but notice of his right" to accept the merger price for his shares or demand an appraisal. *Id.* at 635. The Second Circuit rejected this argument, writing that "it is precisely because appellee gives no choice to Vine under the statute and the latter must now exchange his shares for cash that appellant can now be deemed a seller." *Id.* The court further found that "because of the distinctive nature of the short form merger," defendants could, by deceiving some of Crown's shareholders, force other non-voting shareholders to sell their shares. *Id.* The court distinguished *Vine* from a case involving "a stockholder who refuses to accept a fraudulent offer to purchase his stock but remains a stockholder in an existing corporation . . . ." *Id.*

The forced seller doctrine was adopted and expanded by the United States Court of Appeals for the Fifth Circuit in *Coffee v. Permian Corporation*, 434 F.2d 383 (5th Cir. 1970), which decision

is binding on this Court.[6]  In *Coffee*, Permian Corporation owned the majority of shares in Knight Company.  Charles Coffee was a minority shareholder of Knight.  Coffee alleged that Permian committed securities fraud in violation of § 10b and Rule 10b-5 when it caused the liquidation of the assets of Knight without a shareholder vote.  As a result, Coffee argued that the minority shareholders were left with only a claim for proceeds from the liquidation, even though Knight had not subsequently been dissolved.  *Id.* at 385-86.

The Fifth Circuit held that Coffee had standing to bring a § 10(b) and Rule 10b-5 action against Permian for alleged fraudulent manipulations in connection with the liquidation because the minority shareholders' "stock has been converted into a claim for cash." *Id.* at 386.  The Fifth Circuit recognized that the fact finder might later determine that Coffee was not a forced seller if it was established that Knight continued to carry on business despite the liquidation of its assets.  However, it noted that at the motion to dismiss stage of the litigation, it must accept the allegation that Coffee's stock in Knight had been effectively converted into a claim for cash, thus giving him standing under the forced seller doctrine.  *Id.* at 386. In a subsequent decision, the Fifth Circuit again found that a securities fraud plaintiff had standing under the forced seller doctrine even though the corporation in which he held shares still existed because the corporation "had . . . been substantially liquidated and [was] a non-functioning corporation within the principle of Vine and Coffee." *Dudley v. Southeastern Factor and Finance Corp.*, 446 F.2d 303, 308 (5th Cir. 1971).

---

[6]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions handed down by the former United States Court of Appeals for the Fifth Circuit prior to the close of business on September 30, 1981. Decisions by the Unit B panel of the former Fifth Circuit are binding precedent as well.  *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

After the decisions in *Vine* and *Coffee*, the United States Supreme Court reaffirmed the purchaser/seller requirement for standing to maintain a claim under § 10b and Rule 10b-5 in *Blue Chip Stamps v. Manor Drug Store*, 421 U.S. 723 (1975).  In *Blue Chip Stamps*, the Court cautioned against expansion of the class of purchasers and sellers.  It held that an individual who was offered the opportunity to purchase stock pursuant to an antitrust consent decree for which an allegedly deceptive prospectus was issued did not have standing to bring a claim under § 10b and Rule 10b-5 because he had neither purchased nor sold the stock at issue.  The Court cited the *Vine* decision in a footnote, but it did not address the continued viability of the forced seller doctrine.  *Id.* at 747 n.10.

After the decision in *Blue Chip Stamps,* the Fifth Circuit confirmed the continuing viability of the forced seller doctrine in *Alley v. Miramon*, 614 F.2d 1372 (5th Cir. 1980).  The *Alley* court reasoned that "[t]he forced seller doctrine does not undermine the policy objections of Blue Chip" because "[w]hen applied in the context of a corporate liquidation, the forced seller exception does not create a danger of an abuse of the litigation process comparable to that which concerned the Blue Chip Court."  *Id.* at 1386.

In the present case, Southern Life convinced the majority of shareholders in PSC to approve the sale of PSC's sole asset, the Debenture, allegedly through fraudulent omissions and misrepresentations.  As a result, as in *Vine*, *Coffee*, and *Dudley*, PSC's shareholders are left with two options: 1) converting their PSC stock to their portion of the cash obtained from sale of the Debenture; or, 2) holding stock in a shell corporation that must dissolve under the terms of its Articles of Incorporation "as soon as reasonably practicable" after the sale of the Debenture.  Art. of Incorp. at 5.  Under *Coffee* and *Dudley*, it is not relevant that the PSC has not yet been liquidated because there is no indication that PSC continued to carry on business after the sale of the Debenture.

There is one crucial difference between the present case and *Vine* and *Coffee*, however.  In *Vine* and *Coffee*, the shareholders who alleged that they had been injured were not given notice of or opportunity to vote on the transaction that converted their shares into claims for cash.  This occurred in *Vine,* a  short-form merger case,  because the vote of the minority shareholders in the acquired corporation was not needed to effect the merger.  It was similarly true in *Coffee*, an asset liquidation case, because a vote of the shareholders was not required to permit the liquidation of the corporation's assets.  Indeed, the *Vine* court wrote that the forced seller doctrine applied precisely because the shareholders had no choice in the transaction that converted their shares into claims for cash.

In contrast, in the present case a vote of the PSC shareholders was necessary to permit the sale of the Debenture.  The plaintiffs, as shareholders of PSC, were given notice of the proposed transaction and an opportunity to vote on it.  Even though the named plaintiffs' opposition to the sale of the Debenture was not the view of the majority of the PSC shareholders, the named plaintiffs did not thereby become forced sellers.  Rather, as discussed in section of this report headed "The Plaintiffs as Sellers of Securities," the named plaintiffs are merely disappointed minority shareholders adversely affected by the vote of the majority of the shareholders.  As such, the forced sale doctrine cannot confer standing on them.

### 2.   The Action for Common Law Fraud.

In Count II of the class action complaint, the plaintiffs allege a cause of action for common law fraud under Florida law.  The allegations in Court II are premised on the same facts that underlie Count I.  In sum, the plaintiffs allege (1) that Southern Life omitted and misrepresented material facts in its dissemination of information, including the Valuation, to PSC and the plaintiffs, (2) that Southern Life knew or should have known of the falsity of the disseminated information, (3) that

Southern Life intended to induce the plaintiffs to rely on the false information to vote to approve the sale of the Debenture, and, (4) that plaintiffs were injured in reliance on the false information. Compl. ¶¶ 55-58. The plaintiffs do not allege that they suffered individual injuries that were not common to all shareholders and to PSC.

Southern Life argues that the plaintiffs lack standing to bring an action under Florida common law for fraud. Southern Life asserts that any representations made concerning the Debenture were made to PSC, which held the Debenture, and not to the shareholders individually. Doc. No. 40 at 17-18. The plaintiffs did not directly address this issue in their reply brief.

Under Florida law, a shareholder of a corporation cannot bring an individual claim against a third party for harm suffered by the corporation. *Warter v. Boston Sec., S.A.*, No. 03-81026-CIV/RYSKAMP, 2004 WL 691787, at *9 (S.D. Fla. Mar. 22, 2004)(citing *Hill v. Brady*, 737 So. 2d 1243, 1244 (Fla. 5th Dist. Ct. App. 1999)). Thus, Florida law requires that a determination be made whether the plaintiffs have a "cause of action in their own right or whether their cause of action is derived from the corporation's right to bring the action." *Alario v. Miller*, 354 So. 2d 925, 926 (Fla. 2d Dist. Ct. App. 1978). An action will either be considered a derivative or a direct action. *Id.*

> An action brought by a stockholder is derivative if the gravamen of the complaint is injury to the corporation or to the whole body of its stock or property and not injury to the plaintiff's individual interest as a stockholder. . . . Conversely, a direct action, or as some prefer, an individual action, is a suit by a stockholder to enforce a right of action existing in him.
>
> What these definitions attempt to convey is that a stockholder may bring a suit in his own right to redress an injury sustained directly by him, and which is separate and distinct from that sustained by other stockholders. If, however, the injury is primarily against the corporation, or the stockholders generally, then the cause of action is in the corporation and the individual's right to bring it is derived from the corporation.

*Id.*

In *AmSouth Bank v. Wynne*, 772 So. 2d 574, (Fla. 1st Dist. Ct. App. 2000), the court considered the *Alario* distinction between individual and derivative claims in the context of direct claims of fraud brought by shareholders of Dealers Insurance Co. (DICO) against AmSouth Bank alleging that as a result of AmSouth's false representations, DICO failed, thereby injuring DICO's shareholders. The *Wynne* court, in reliance on *Alario*, found that the plaintiffs' damages "flowed primarily from injuries to DICO . . . . The injuries to [the plaintiff shareholders] were indirect, indistinct from injuries to other shareholders, and did not provide a basis for these individual suits." *Id.* at 575. Therefore, the court ordered the trial court to enter judgment for AmSouth Bank. *Id.*

As in *Wynne,* in the present complaint, the plaintiffs allege that Southern Life disseminated false information to PSC and its shareholders, upon which plaintiffs relied to their detriment. Based on Southern Life's misrepresentations, PSC sold the Debenture to Southern Life at a price less than its true value, thereby injuring the plaintiffs. These allegations are insufficient to allege an injury to the plaintiffs separate and distinct from the injuries to PSC and all of its shareholders. Therefore, the plaintiffs do not have standing to bring a direct action for fraud against Southern Life. *See also Hyatt v. AmSouth Bank*, Case No. 3:98-cv-1269-J-20A, doc. no. 82, *aff'd*, 233 F.3d 579 (11th Cir. 2000)(the text of the Eleventh Circuit's decision can be found in Case No. 3:98-cv-1269-J-20A, doc. no. 94).

## V.    RECOMMENDATION.

For the reasons discussed herein, I respectfully recommend that the Court **DENY** Plaintiffs' Motion for Class Certification, doc. no. 38, and take such other action as it deems appropriate with respect to the issue of standing. The Court may dismiss the complaint for lack of standing or permit

the plaintiffs to file an amended complaint if they can proffer facts sufficient to establish that they would have standing to proceed on any cause of action.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on March 19th, 2008.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy